USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/16/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
RELIABLE AUTOMATIC SPRINKLER CO. :
INC., :
 :
                            Plaintiff, :      1:20-cv-2369-GHW
 :
          -against- : MEMORANDUM OPINION
 : AND ORDER
SUNBELT GROUP L.P., :
 :
                         Defendant. :
-----------------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

      Reliable Automatic Sprinkler Co. Inc. ("Reliable") contracted to buy steel products from Sunbelt Group L.P. ("Sunbelt"). The contract was to govern all future sales between the parties, and the parties agreed to litigate any disputes in Texas. Almost a decade later, Reliable proposed a new contract to govern the parties' future sales. Reliable's proposal included a provision designating New York, not Texas, as the forum for the parties to litigate their disputes. Sunbelt sent Reliable a counteroffer with a few amendments, though it didn't propose to change the forum-selection clause. But Sunbelt didn't say it was making a counteroffer, and Reliable didn't read what Sunbelt sent. So Reliable didn't realize that Sunbelt's version of the contract was a counteroffer and not an acceptance. Because of the mix-up, Reliable never agreed to Sunbelt's amended terms and Sunbelt never agreed to Reliable's original terms.

      A couple years after the parties exchanged their proposals, Reliable sued Sunbelt in New York. Sunbelt now moves to transfer the case to Texas under the forum-selection clause in the original contract. Because the parties did not agree to the material terms of Reliable's offer (or Sunbelt's counteroffer), the parties' initial contract governs this dispute. And that contract has a forum-selection clause designating Texas as the exclusive forum for the parties to litigate their disputes, so Sunbelt's motion to transfer is GRANTED.

**I. BACKGROUND**

    **A. Facts**

        **1. The Initial Sale Agreement**

Sunbelt manufactures steel products. Reliable makes fire protection products, like sprinklers, that require steel as an input. Declaration of Bob Hultgren ("Hultgren Dec."), Dkt No. 27, ¶ 2. So Reliable bought steel from Sunbelt starting in 2005. *See id.* ¶ 6; *see also* Ex. 1 to Hultgren Dec. For the first three years, neither party signed an agreement and Reliable paid Sunbelt over $400,000. Hultgren Dec. ¶¶ 7-8.

In July 2008, Reliable sought a line of credit from Sunbelt to purchase its steel products. *Id.* ¶ 9. In response, Sunbelt sent Reliable some "Conditions of Sale." Declaration of Beau Batterson ("Batterson Dec."), Dkt No. 22, ¶ 3. The cover letter on the Conditions of Sale said that "[a]ll future transactions between our companies will be subject to the enclosed Conditions of Sale." *Id.* ¶ 4. The cover letter said that Reliable should "review" the Conditions and "indicate [its] acceptance of the same by having [an] authorized representative sign on the line provided" on the cover letter. Initial Sale Agreement, Ex. A to Batterson Dec. at 1. Bob Hultgren, Vice President and Chief Financial Officer of Reliable, executed the cover letter accepting Sunbelt's "Conditions of Sale." Hultgren Dec. ¶ 9.

The parties thus formed their "Initial Sale Agreement." *Id.* In the Initial Sale Agreement, Reliable is the "Buyer" and Sunbelt is the "Seller." The Initial Sale Agreement has a few provisions that are relevant to this motion. First, the Initial Sale Agreement has choice-of-law and forum-selection clauses. Initial Sale Agreement at 3, § 19. These clauses state that Texas law applies and that courts in Texas have exclusive jurisdiction over related disputes:

> These Conditions of Sale as well as any contract or transaction subject to these conditions of sale shall be governed by the laws of the State of Texas. In any proceeding to enforce or interpret these conditions of sale or arising from any contract or transaction subject to these conditions of sale, Buyer expressly consents to the

exclusive jurisdiction of the state and federal courts of the state of Texas and venue shall be proper in Harris County.

*Id.* (capitalization altered). This provision is in all capital letters for emphasis in the Initial Sale Agreement. *See id.*

Second, the Initial Sale Agreement states that the Conditions of Sale apply to all future transactions between the parties: "These Conditions of Sale shall apply to any and all future transactions between Buyer and Seller, but these Conditions of Sale shall not obligate Seller to extend credit to Buyer or make any future sales to Seller." *Id.* at 3, § 20. Third, the Initial Sale Agreement has an integration clause. The integration clause includes a proviso that any amendment to the Initial Sale Agreement must be in writing. The integration clause provides: "This agreement constitutes the entire understanding of parties with respect to the subject matter hereof, supplants and supersedes any prior agreements or understandings and may only be amended or modified by an agreement in writing executed by both parties." *Id.* at 3, § 21.

### 2. The Vendor Agreement and the Amended Vendor Agreement

Fast forward to 2017. The two parties had been doing business for almost a decade. Reliable decided "to fortify its legal rights and remedies" for "its business dealings with its vendors as set forth in Reliable's Terms and Conditions." Hultgren Dec. ¶ 11. So in November 2017, Reliable emailed Sunbelt a Vendor Indemnification and Insurance Agreement (the "Vendor Agreement"). *Id.* ¶ 12; *see also* Ex. 3 to Hultgren Dec. The Vendor Agreement was signed by Rex Schwendiman, Vice President of System Components at Reliable. Declaration of Jaclyn Olson ("Olson Dec."), Dkt No. 28, ¶ 2. The email attaching the Vendor Agreement explained its purpose. That email stated that

> Reliable ownership has mandated a thorough review and update to the legal fundamentals upon which our important relationship rests. Attached here is a document containing clauses extracted from our standard "Terms & Conditions" which include our INDEMNIFICATION (hold harmless) terms . . . This is an URGENT matter, and immediate compliance is sought. Please review this material,

3

and sign the document where indicated and return it to us by email or post ASAP.

*Id.* ¶ 3 (emphasis omitted); *see also* Ex. 1 to Olson Dec.

The Vendor Agreement had several material terms. The first stated that Reliable would not buy goods from a vendor that failed to abide by its terms. That provision stated:

> The undersigned Vendor represents and warrants that the person signing on its behalf is authorized to do so, that such signature binds Vendor, and that Vendor . . . has read and understands the requirements and obligations set forth in this document, and acknowledges that but for Vendor's agreement to be bound by and conform to these requirements, Reliable Automatic Sprinkler Co., Inc. (Reliable) would not engage Vendor to provide goods and services to Reliable, and that such engagement constitutes good, valuable and sufficient consideration for Vendor's agreement hereto.

Vendor Agreement at 1; *see also* Hultgren Dec. ¶ 15. The Vendor Agreement also included a provision that required vendors to indemnify Reliable. Vendor Agreement at 1, § 1. And it required Reliable's vendors to have insurance and provide a certificate of insurance to Reliable to verify that fact. *Id.* at 1, § 2; *see also* Hultgren Dec. ¶ 14.

Most important for this motion, the Vendor Agreement had its own forum-selection and choice-of-law clauses. These clauses provided that New York law governed disputes arising under the Vendor Agreement and that courts in New York had exclusive jurisdiction over any such disputes:

> All matters arising out of or relating to this Agreement or the relationship of the parties shall be governed by and construed in accordance with the substantive laws of the State of New York without regard to conflicts of law provisions. Any dispute arising out of legal suit, action or proceeding arising out of or relating to this Agreement or the relationship of the parties shall be submitted only in the United States District Court for the Southern District of New York or in the courts of the State of New York located in New York County, and each party irrevocably submits to the exclusive personal jurisdiction of and exclusive venue in such courts.

Vendor Agreement at 3, § 3; *see also* Hultgren Dec. ¶ 15.

Sunbelt returned an executed copy of the agreement but with some material changes (the "Amended Vendor Agreement"). *See* Ex. 2 to Olson Dec. In December 2017, Beau Batterson, Sales Manager at Sunbelt, sent Jackie Olson, an administrative assistant at Reliable, the Amended

4

Vendor Agreement and a certificate of insurance. Olson Dec. ¶ 5. The Amended Vendor Agreement materially deviated from the Vendor Agreement. It limited the scope of the indemnity provision by restricting Sunbelt's maximum aggregate liability and otherwise limiting liability. Amended Vendor Agreement at 2, § 1. It also removed a requirement from the insurance provision that Sunbelt's insurance policies contain a "waiver of subrogation and cross liability coverage" and "be considered primary, without right of contribution and with deductibles acceptable to Reliable." *Id.* at 2, § 2. But Sunbelt did not change the choice of law and forum-selection provisions. *Id.* at 3, § 3.

Sunbelt also changed the signature block on the Amended Vendor Agreement. *Id.* at 3. Recall that the initial Vendor Agreement had been signed by Schwendiman, a Reliable employee, when Reliable sent it to Sunbelt. Vendor Agreement at 3. The signature block on the Vendor Agreement looked like this:

```
ACCEPTED AND AGREED TO:
Date: _____      Date: March 16, 2016
Vendor legal name: _____      THE RELIABLE AUTOMATIC
                                    SPRINKLER CO., INC.
Vendor address: _____       103 Fairview Park Drive
                _____       Elmsford, NY 10523
                _____

By: _____       By: [signature]
        Signature                           Signature
Name: _____       Name: Rex Schwendiman
Title: _____       Title: V.P. System Components
```

Sunbelt removed that signature block and added a new signature block. Amended Vendor Agreement at 3. Further confusing matters, Sunbelt COO David Butterbrodt signed on the line

reserved for a Reliable representative. *Id.* That signature was in addition to the signatures of two other Sunbelt corporate representatives on the line reserved for Sunbelt. *Id.* The signature block on the Amended Vendor Agreement looked like this:

```
ACCEPTED AND AGREED TO:                              Date:
Date:      December 6, 2017
                                                     THE RELIABLE AUTOMATIC
Sunbelt Group L.P.                                   SPRINKLER CO., INC.
1900 Post Oak Boulevard, Suite 950
                                                     103 Fairview Park Drive
Houston, Texas 77056-3817
                                                     Elmsford, NY 10523


By [signature] [signature]              By: [signature]
   Signature                                Signature
Name:  Ryan MacDermid / S. McKelvey         David T. Butterbrodt
Title: Vice President / Asst. Sec.          Chief Operating Officer
                                            Sunbelt Group L.P.
```

Sunbelt didn't note its changes. The Amended Vendor Agreement itself didn't flag that Sunbelt had made changes. Olson Dec. ¶ 7. And, according to Reliable, Batterson's email did not say that there had been any changes. *Id.* ¶ 6. Batterson attests that "Sunbelt *created* a redline comparison showing the changes that it made to the document." Batterson Dec. ¶ 19 (emphasis added); *see also* Redline Comparison, Ex. D to Batterson Dec. But Sunbelt doesn't say that it *sent* the redline marking the changes to Reliable. So Olson—who received the Amended Vendor Agreement—didn't notice them. Olson Dec. ¶ 6. Because Olson didn't realize that there had been any changes to the Vendor Agreement in the version executed and returned by Sunbelt, she "filed the Vendor Agreement" instead of notifying "a Reliable executive." *Id.* ¶ 7. In other words, Reliable thought that Sunbelt had accepted the terms of the original Vendor Agreement, but that was not true. And Sunbelt never asked whether Reliable had accepted the terms of the Amended Vendor Agreement.

6

### 3. The Terms

Reliable kept purchasing steel from Sunbelt. Reliable placed purchase orders for steel pipes with Sunbelt between May 2018 and April 2019. Batterson Dec. ¶ 9. Sunbelt sent Reliable sixty-seven invoices (the "Invoices") associated with those purchase orders. *Id.* ¶ 10; *see also* Ex. B to Batterson Dec. The invoices noted that they were "[s]ubject to the attached Terms and Conditions of Sale" (the "Terms"). Batterson Dec. ¶ 12; *see also* Invoices at 27-28. The Terms referred Reliable as the "Purchaser" and Sunbelt as the "Vendor." The Terms stated that they applied to all transactions between Reliable and Sunbelt:

> These terms and conditions of sale (the "Terms") shall apply to any quote, purchase order, order acknowledgment, invoice and any other document used to place an order . . . No Additional or differing terms communicated by Purchaser shall be binding and Vendor shall not be deemed to accept any such other terms for failure to object to them in any communications received from Purchaser. Any purchase order or other document sent by Purchaser to Vendor shall be for its own internal purposes and shall not constitute part of the agreement between the parties.

Terms at 1, § 1.

The Terms also had their own forum-selection and choice-of-law clauses, again designating Texas as the only appropriate forum to litigate disputes between the parties: "The Agreement shall be governed by and construed in accordance with the laws of the State of Texas federal laws of the United States applicable therein. The parties irrevocably submit to the exclusive jurisdiction of the courts of the State of Texas." *Id.* at 2, § 10. And the Terms had an integration clause: "The Agreement constitutes the final written expression of all of the agreements between the parties with respect to the subject matter herein, and supersedes all understandings and negotiations concerning the matters specified herein." *Id.* at 2, § 13. Reliable never objected to the Terms. Batterson Dec. ¶ 15. It accepted pipes from Sunbelt and paid the Invoices. *Id.*

**B. Procedural History**

In February 2020, Reliable sued Sunbelt in New York state court, alleging that Sunbelt's

7

pipes were defective. *See* Dkt No. 1-1. Sunbelt removed the case to this Court. Dkt No. 1. Sunbelt moved to transfer the case to Texas. Dkt Nos. 20-23. Reliable opposed the motion, Dkt Nos. 27-29, and Sunbelt replied, Dkt No. 32.

## II. LEGAL STANDARD

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). "District courts have broad discretion" to determine "convenience under Section 1404(a) and notions of convenience and fairness are considered on a case-by-case basis." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 106 (2d Cir. 2006) (citation omitted). District courts consider several factors, including

> (1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, and (7) the relative means of the parties.
>
> *Id.* at 106-07 (quoting *Albert Fadem Trust v. Duke Energy Corp.*, 214 F. Supp. 2d 341, 343

(S.D.N.Y. 2002)) (brackets omitted); *see also Gottlieb v. United States SEC*, 723 F. App'x 17, 19 (2d Cir. 2018).

Forum-selection clauses generally override this multifactor balancing test, however. "[A] forum-selection clause be 'given controlling weight in all but the most exceptional cases.'" *Atl. Marine Constr. Co. v. United States Dist. Court*, 571 U.S. 49, 59-60 (2013) (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 33 (1988) (Kennedy, J., concurring)). Indeed, "[w]hen the parties have agreed to a valid forum-selection clause, a district court should ordinarily transfer the case to the forum specified in that clause. Only under extraordinary circumstances unrelated to the convenience of the parties should a §1404(a) motion be denied." *Id.* at 62 (footnote omitted).

"[T]he party requesting transfer carries the 'burden of making out a strong case for transfer.'" *N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 114 (2d Cir. 2010)

(quoting *Filmline (Cross-Country) Prods., Inc. v. United Artists Corp.*, 865 F.2d 513, 521 (2d Cir. 1989)). District courts "have consistently applied the clear and convincing evidence standard in determining whether to exercise discretion to grant a transfer motion." *Id.* (collecting cases).

## III. DISCUSSION

The forum-selection clause in the Initial Sale Agreement requires that the Court transfer this case to Texas.[1] Neither party disputes, and the Court agrees, that the Initial Sale Agreement was a valid contract or that it contained a valid forum-selection clause that would support transferring this motion to Texas. Both parties also seem to agree that the Vendor Agreement was *not* a valid contract because Sunbelt never accepted its terms.

But Reliable argues that it formed a contract with Sunbelt when Sunbelt returned the Amended Vendor Agreement. The Amended Vendor Agreement includes a forum-selection clause vesting jurisdiction in New York courts.

The obvious problem with this argument is that Reliable and Sunbelt never signed the same version of the Vendor Agreement. Reliable sent a signed version of the Vendor Agreement to Sunbelt; Sunbelt returned a signed version of the Amended Vendor Agreement to Reliable. But the parties never signed the same version of the Vendor Agreements. For that reason, Sunbelt argues that the parties never agreed on the material terms of the Vendor Agreement or the Amended Vendor Agreement, and so there was no contract. *See T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992) (applying Texas law and holding that the "material terms of the contract must be agreed upon" to form a contract); *Stonehill Capital Mgmt. LLC v. Bank of the W.*, 28 N.Y.3d 439, 448 (2016) (applying New York law and holding that "[t]o form a binding contract

---

[1] Sunbelt argues that the Court should apply Texas law on this motion but concedes that "[a]s a practical matter, it is immaterial whether Texas or New York law applies[.]" Memorandum of Law in Support of Motion to Transfer, Dkt No. 21, at 10 n.5. Reliable argues that the Court should apply New York law but notes that both New York and Texas have adopted the UCC. Memorandum of Law in Opposition to Motion to Transfer, Dkt No. 26, at 15 (citing N.Y. U.C.C. L. §§ 1-101–13-105 (2011); Tex. Bus & Com. Code Ann. §§ 1.101–11.108 (2011)). The parties thus agree, as does the Court, that it doesn't matter whether the Court applies New York or Texas law.

9

there must be a meeting of the minds, such that there is a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms" (quotations omitted)).

Recognizing this difficulty, Reliable argues that the parties formed a contract under Uniform Commercial Code § 2-207 ("Section 2-207"). Section 2-207(1) provides:

> A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

UCC § 2-207(1). This section governs disputes based on the infamous "battle of forms—the all too common business practice of blithely drafting, sending, receiving, and filing unread numerous purchase orders, acknowledgments, and other diverse forms containing a myriad of discrepant terms. In such situations, UCC 2-207 governs whether a contract has been formed, and if so its terms." *CT Chems., Inc. v. Vinmar Impex, Inc.*, 81 N.Y.2d 174, 179 (1993) (quotations omitted).

But Section 2-207 does not override the fundamental precept of contract law that "there must be a meeting of the minds," so "that there is a manifestation of mutual assent" that is "sufficiently definite to assure that the parties are truly in agreement with respect to *all material terms*" to "form a binding contract." *Stonehill*, 28 N.Y.3d at 448 (emphasis added) (quotations omitted).[2] "Examples of material terms include subject matter, price, payment terms, quantity, timing, compensation, and duration." *SEC v. Rorech*, 720 F. Supp. 2d 367, 408 (S.D.N.Y. 2010) (citing *Local 917, Int'l Bhd. of Teamsters v. N.L.R.B.*, 577 F.3d 70, 74 (2d Cir. 2009)).

---

[2] *See, e.g.*, *S. Cent. Steel, Inc. v. McKnight Constr. Co.*, 263 F. App'x 806, 809 (11th Cir. 2008) (holding that a "'meeting of the minds' is a condition precedent to application of section 2-207" (citing *Duval & Co. v. Malcom*, 214 S.E.2d 356 (Ga. 1975)); *Steel Benders, Inc. v. H.R. Braner Eng'g, Inc.*, No. 86-2368, 1988 U.S. Dist. LEXIS 711, at *13 (D. Kan. Jan. 27, 1988) (Section 2-207 "does not abrogate the common law requirement of a 'meeting of the minds.' '[A]n "acceptance" is a prerequisite to the application of § 2-207. Only where all the traditional criteria of intent are met showing that a contract has been made should Section 2-207 be applied.'" (quoting *U.S. Industries, Inc. v. Semco Manufacturing, Inc.*, 562 F.2d 1061, 1067 (8th Cir. 1977)) (ellipsis omitted)); *Nebraska Mach. Co. v. Cargotec Sols., LLC*, No. 8:12-cv-394, 2013 WL 310640, at *5 (D. Neb. Jan. 25, 2013), *vacated on other grounds*, 762 F.3d 737 (8th Cir. 2014).

Reliable and Sunbelt did not agree to the material terms of the Vendor Agreement or the Amended Vendor Agreement. Sunbelt proposed restricting its maximum aggregate liability and made changes to the insurance provision in the Amended Vendor Agreement. Amended Vendor Agreement at 2, §§ 1-2. Those changes went to the heart of the Vendor Agreement, and the parties never agreed which set of terms should govern. Thus, neither the Vendor Agreement nor the Amended Vendor Agreement was a valid contract.

Section 2-207(1) does not apply here. Section 2-207(1) states that "[a] definite and seasonable expression of acceptance or a written confirmation" can "operate[] as an acceptance." UCC § 2-207(1). The Amended Vendor Agreement was not a "definite . . . expression of acceptance" by Sunbelt. *Id.* Sunbelt proposed multiple material modifications to the Vendor Agreement in the Amended Vendor Agreement. The result might be different if a Sunbelt representative had emailed a Reliable representative "Sunbelt accepts your offer" and attached the Amended Vendor Agreement. But there is no evidence in the record that Sunbelt ever told Reliable that it accepted the Vendor Agreement. As explained in a leading treatise on the UCC:

> [n]ot all return documents are 2-207(1) "acceptances." If the return document diverges significantly as to a dickered term, it cannot be a 2-207(1) acceptance. For example, if the purchase order calls for the sale of 200,000 pounds of lard at $0.10 a pound and the acknowledgment responds with 200,000 pounds at $0.15 a pound, the second document is not an acceptance under 2-207(1), and no contract is formed via the exchange of forms.

1 White, Summers, & Hillman, *Uniform Commercial Code* § 2:17 (6th ed. 2019) (footnote omitted).

As described above, the Amended Vendor Agreement made substantial, material changes to the indemnification and insurance provisions of the Vendor Agreement. The Amended Vendor Agreement diverged substantially from the Vendor Agreement with respect to those "dickered" terms, so it was not an acceptance under Section 2-207(1). And the Amended Vendor Agreement does not even remotely resemble a "written confirmation[.]" *See* UCC § 2-207 cmt. 1 (explaining that a when "written confirmation" follows only after "an agreement has been reached either orally

11

or by informal correspondence between the parties"). So the parties did not form a contract under Section 2-207(1).[3]

Section 2-207(2) also offers Reliable no help because "[b]y the terms of § 2-207, a contract can only be formed under § 2-207(1) or § 2-207(3)[.]" *Option Wireless, Ltd. v. OpenPeak, Inc.*, No. 12-cv-80165, 2012 WL 6045936, at *5 (S.D. Fla. Dec. 5, 2012). Section 2-207(2) provides:

> The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless: (a) the offer expressly limits acceptance to the terms of the offer; (b) they materially alter it; or (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

UCC § 2-207(2). As its text makes clear, parties cannot form a contract under Section 207(2). Rather, "[i]f a contract is properly formed under § 2-207(1), § 2-207(2) is applied merely to determine that contract's terms." *Option Wireless*, 2012 WL 6045936, at *5 *see also Coastal & Native Plant Specialties, Inc. v. Engineered Textile Prods., Inc.*, 139 F. Supp. 2d 1326, 1337 (N.D. Fla. 2001) ("[S]ubsection (2) only becomes operative when a contract is formed under subsection (1)."). So the parties cannot have formed a contract under Section 2-207(2).

Nor does Section 2-207(3) save Reliable. That section provides:

> Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act.

*Id.* § 2-207(3). Under Section 2-207(3), "a manifestation of mutual assent may be inferred wholly or

---

[3] Reliable also argues that it formed a contract with Sunbelt by failing to return the Amended Vendor Agreement. That argument is unavailing. Reliable relies on comment 6 to Section 2-207. That comment states in part: "If no answer is received within a reasonable time after additional terms are proposed, it is both fair and commercially sound to assume that their inclusion has been assented to." UCC § 2-207 cmt. 6. Reliable argues that because it did not object to the Amended Vendor Agreement, it impliedly assented to Sunbelt's material alterations. Because Sunbelt did not alter the forum-selection clause, Reliable argues, the parties formed a contract that included that clause. But comment six does not address contract formation. It speaks to when *additional* terms can become part of an existing contract. Because the parties' exchange of the Vendor Agreement and the Amended Vendor Agreement did not form a contract, comment 6 does not apply.

partly from the conduct of the parties." *Tapemark Co. v. E-Z Cleaners, LLC*, No. 10-cv-813 (SRN) (TNL), 2012 WL 246053, at *6 (D. Minn. Jan. 25, 2012) (quoting *Hy-Vee Food Stores, Inc. v. Minn. Dep't of Health*, 705 N.W.2d 181, 186 (Minn. 2005)) (alterations omitted). Section 2-207(3) permits a court to infer the existence of a contract because when "goods are shipped, accepted and paid for before any dispute arises, there is no question whether a contract has been made." UCC § 2-207 cmt. 7.

The Court cannot infer from the parties' actions that both Reliable and Sunbelt agreed to the Vendor Agreement or the Amended Vendor Agreement because the parties' actions are also consistent with the Initial Sale Agreement. *Cf. Tra Indus., Inc. v. Valspar Corp.*, No. 10-cv-26 (JLQ), 2010 WL 2854251, at *5 (E.D. Wash. July 19, 2010) ("Actions taken in accordance with an existing contractual obligation cannot indicate assent to a modification thereof. For a party's course of performance to indicate assent to a modification, the performance must be related in some affirmative manner to the proposed modification and differ from the performance already required of the party by the existing contract.").

Reliable notes that the Vendor Agreement said that "but for Vendor's agreement to be bound by and conform to these requirements, Reliable Automatic Sprinkler Co., Inc. (Reliable) would not engage Vendor to provide goods and services to Reliable." Vendor Agreement at 1. Reliable argues that this shows that it would have continued to do business with Sunbelt if Sunbelt didn't sign the Vendor Agreement. Reliable contradicts itself: It argues elsewhere in its opposition that *Sunbelt's* terms, as proposed in the Amended Vendor Agreement, should control. *See* Opposition to Motion to Transfer, Dkt No. 26, at 10-11. So it is not true that Reliable would only do business on the terms proposed in the Vendor Agreement.

In any event, the key question under Section 2-207(3) remains whether the Court can infer the existence of a new contract that is separate from the Initial Sale Agreement based on the parties'

13

actions. Because both parties' actions accord with the terms of the Initial Sale Agreement, the Court cannot do so.

All this reasoning confirms that the Vendor Agreement is properly analyzed as a proposed modification of the existing Initial Sale Agreement. Neither the Vendor Agreement nor the Amended Vendor Agreement were signed by both parties, so neither could modify the Initial Sale Agreement as a matter of law.

UCC § 2-209 ("Section 2-209") governs modifications. *See CT Chems.*, 81 N.Y.2d at 179 ("Once a contract is formed, the parties may of course change their agreement by another agreement, by course of performance, or by conduct amounting to a waiver or estoppel. In order to determine the terms of such change, [courts] look to UCC 2-208 and 2-209, not 2-207.").[4] Under Section 2-209, "[a] signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded." UCC § 2-209(2). The Initial Sale Agreement has a no-modification clause: "This agreement . . . may only be amended or modified by an agreement in writing executed by both parties." Initial Sale Agreement at 3, § 21. There was no agreement in writing executed by both Reliable and Sunbelt that could modify the Initial Sale Agreement because—at the risk of belaboring the point—neither the Vendor Agreement nor the Amended Vendor Agreement was signed by both parties. So neither of those documents could modify the Initial Sale Agreement. *See* UCC § 2-209(2).[5]

---

[4] *See also Besicorp Grp. v. Thermo Electron Corp.*, 981 F. Supp. 86, 98 (N.D.N.Y. 1997) (holding that Section 2-207 "only applies to the *formation* of a contract and is irrelevant once the parties have reached an agreement"); *Am. Licorice Co. v. Total Sweeteners, Inc.*, No. C-13-1929 (EMC), 2013 WL 4396778, at *6 (N.D. Cal. Aug. 13, 2013) ("Courts have recognized that this section is inapplicable where a contract has already been formed and additional terms are contained in a subsequent communication." (citing *Besicorp*, 981 F. Supp. at 98)); *Tosco Corp. v. Oxygenated Mktg. & Trading A.G.*, No. 98-cv-4695 (LMM), 1999 WL 328342 (S.D.N.Y. May 24, 1999), *aff'd sub nom. Bayway Ref. Co. v. Oxygenated Mktg. & Trading A.G.*, 215 F.3d 219 (2d Cir. 2000) (citing *Besicorp*, 981 F. Supp. at 98).

[5] *See also A&L Auto Repair, Inc. v. Hudson Petroleum Realty, LLC*, No. 17-cv-3529 (NG) (RLM), 2018 WL 10517080, at *5 (E.D.N.Y. Mar. 6, 2018) ("Authorities cited by plaintiffs for the proposition that parties may alter portions of their agreement through their course of performance are inapplicable here because the contracts are comprehensive and require that all modifications be in writing."); *Marcus Bros. Textiles, Inc. v. Avondale Mills, Inc.*, 433 N.Y.S.2d 114, 115 (1st Dep't 1980).

The Initial Sale Agreement is thus the controlling agreement between the parties. It has a forum-selection clause mandating transfer of this case to Texas. "[A] forum-selection clause should be given controlling weight in all but the most exceptional cases." *Atl. Marine*, 571 U.S. at 59-60 (quotation omitted). Neither party argues that this is an exceptional case, and the Court sees no reason to conclude that it is. The Court will therefore grant the motion to transfer.

At bottom, Reliable could have avoided the result in this case if it had read the version of Vendor Agreement that Sunbelt returned to it. Sunbelt could have been clearer that it had made changes to the Vendor Agreement. And the decision to have a third Sunbelt representative sign on the line for a Reliable representative to sign—even though presumably one Sunbelt signature would have sufficed—is difficult to understand. But despite Sunbelt's puzzling behavior, Reliable must live with the consequences of its oversight.

## IV. CONCLUSION

Sunbelt's motion to transfer is GRANTED. The Clerk of Court is directed to terminate the motion pending at Dkt No. 20 and to transfer this case to the Southern District of Texas without delay.

SO ORDERED.

Dated: July 16, 2020

GREGORY H. WOODS
United States District Judge